BEFORE THE FIRST DIVISION, APRIL 22, 1954

**No. 58022.**—Willey Biggin Wool Service, Inc. *v.* United States, protest 179028–K (Detroit).

OLIVER, Chief Judge: This case relates to merchandise described on the invoice as "Greasy Colored Wool Card Waste," which the collector regarded as consisting of two different kinds of wool wastes, i. e., roving waste and card waste. Duty was assessed at the rate of 28 cents per pound, being the rate applicable to roving waste under paragraph 1105 (a) of the Tariff Act of 1930, as modified by T. D. 51802. The collector's action invoked the provisions of paragraph 1103 of the Tariff Act of 1930, which provides that:

If any bale or package contains wools, hairs, wool wastes, wool waste material, subject to different rates of duty, the highest rate applicable to any part shall apply to the entire contents of such bale or package, except as provided in paragraphs 1101 and 1102.

Plaintiff claims that the present merchandise is wool card waste, not carbonized, and dutiable as such at the rate of 10½ cents per pound under said modified paragraph 1105 (a).

Our approach to the present controversy and disposition thereof make it unnecessary to refer to judicial authorities that interpreted the provisions of paragraph 1103, *supra*, and which are discussed in the briefs of counsel for both parties. As we view the issue before us, it is purely one of fact, i. e., whether certain disputed fibers are card waste. If they are, then, of course, plaintiff's claim is good; otherwise, the collector's classification must be sustained.

Four well-qualified witnesses—all engaged in the wool waste business for more than 25 years—appeared on behalf of plaintiff. Their combined testimony supports the following summary:

The merchandise in question is acquired from the processing of raw dyed wool, and is generally recognized as "100% wool card waste," or "colored woolen card waste." It is an "accumulation of all card wastes that would accumulate over a period of time, the blue, the green, the brown, all mixed together," and is used in the manufacture of "boys-wear" and other heavy coating or cheap sweaters.

Card waste is the mixture of the long and short fibers that fall down below the carding machines as the wool is going through the carding process in the course of "making roving and yarn and then cloth."

In passing the carding machines (plaintiff's exhibits 2 and 3), the raw wool is fed into a large cylinder or breaker that breaks up the wool, and from there it passes through a series of other cylinders held in position with a canvas back that is wrapped on the carding machine. Those cylinders are equipped with so-called "card clothing" which is a series of wires "coming up vertically and then going off on an angle like a hip." Through operation of the card clothing, the fibers are pulled, gradually straightened, and made parallel. Following this operation, the fibers are passed to the finishing section of the carding machines for further processing toward the end product, which is known as "roving or roping."

The carding process produces as an unavoidable byproduct, two ends made up of fibers that are not uniform in length and possess other inferior qualities unsatisfactory for advanced processing. These endpieces were described as follows (R. 21):

Well, invariably on a woolen card in the production of rovings which ultimately is spun in yarn, the two outside ends are generally and almost without exception are taken and discarded as substandard because of the fact they are on the outside of the cylinder and the yarn there might be insufficient in the weight of the roving

463

so as not to produce standard yarn and they eliminate that chance by discarding the entire end, sucking it back into the feed box to be recarded again and that could very well be what happened here.

The presence of fibers from waste ends, which forms the basis of the present controversy, was explained as follows (R. 23):

Well, I would say that the reason that these could very possibly be in this stock is because of the fact that woolen mills have to change the color and sometimes the grade of yarn that they spin and in cleaning up from one month to another, they would not only take the cleanings from underneath the card but could very well take it from the card feed box itself.

Certain green fibers, removed from the representative sample of the merchandise under consideration (plaintiff's exhibit 1), were identified as coming from "the two outside ends which are blown back into the feed box," plaintiff's exhibit 1–A, that are acquired from carding operations and accidentally result therefrom as the offal of waste ends which are returned to the feed box for recarding. Their presence in this merchandise is a usual condition in card waste. These disputed fibers are distinguishable from roving waste (plaintiff's exhibit 4), which has evidence of being broken off a spool and is even in diameter to the end where it is broken off. The wool waste in question "is too uneven to be like roving waste," and it has the appearance of a "waste from the card before it reached the roving stage and was discarded for that reason."

Defendant's sole witness was the wool administrator for the United States whose duties in the customs service include "general supervision of the importations of wools, hairs, and wool wastes throughout the country." His report, based on an examination of a sample of the imported merchandise (defendant's exhibit B), formed the basis for classifying the wool waste under consideration. He described the result of his examination as follows (R. 73):

Well, when I examined "B" the first time I found that apparently it was a blend of waste. This was evidenced from the various colors present, whites, also portions of pieces of fibers and little odds and ends in the sample so that I was very careful in trying to identify what the sample might contain. I was satisfied that the bulk of the sample contained colored card waste; I was or I also observed certain rovings in the sample which I would identify or which I did identify as roving waste.

The witness admitted that the disputed fibers, exhibit 1–A, *supra*, "could be" waste ends, and, in distinguishing those fibers from the roving waste (plaintiff's exhibit 4), his statements are corroborative of plaintiff's testimony along the same line. In this connection, he stated that there are differences between the two types of fibers in diameter, in tightness, and uniformity of thickness. Although he stated that the waste ends occur during the carding process, he refused to characterize the fibers therefrom as card waste. He called the various colors in the present merchandise "a deliberate mixture" of waste resulting from the different carding operations, and added that this wool waste "is not only blended, but homogenized."

Plaintiff's testimony in rebuttal disputed the sample (defendant's exhibit B) used by the customs officials in their consideration of the shipment in question. On that point, plaintiff's testimony is to the effect that, from the standpoint of size, said sample is not a fair representative sample of the wool waste under consideration.

On the basis of the present record, we find that the preponderance in weight of the evidence establishes that the merchandise in question is the offal or waste from carding operations of raw dyed wool, and, as such, we hold it to be classifiable as card waste, not carbonized, under paragraph 1105 (a), as modified, *supra*, and dutiable at the rate of 10½ cents per pound, as claimed by plaintiff.

The protest is sustained and judgment will be rendered accordingly.