(C. D. 1653)

FAIRFIELD WOOL CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 10, 1954)

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for the plaintiff.
*Warren E. Burger,* Assistant Attorney General (*Joseph E. Weil* and *Alfred A.*
*Taylor, Jr.,* trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar, described on the invoice as "Sheep Skin Scrap," was classified under the provisions of paragraph 1102 (b) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as "Wools, not specially provided for: On the skin," and assessed for duty thereunder at the rate of 24 cents per pound of clean content. Plaintiff claims the merchandise properly dutiable under paragraph 1555 of the said act, as modified by the aforesaid agreement, as "Waste, not specially provided for," at the rate of 7½ per centum ad valorem.

Certain illustrative exhibits are in evidence, namely, samples of merchandise similar to the imported sheepskin scrap (plaintiff's illustrative exhibit 1 and collective illustrative exhibit 2), together with specimens of "tanner's wool," produced from the imported merchandise (plaintiff's exhibit 3), and samples of tanner's wool, obtained from fur scrap processed by the defendant (defendant's illustrative exhibit A). There were further received in evidence samples of the fur scraps from which the tanner's wool obtained by the defendant was processed (defendant's illustrative exhibit B).

The classification by the collector in this case was made pursuant to a ruling of the Bureau of Customs, 77 Treas. Dec. 99, T. D. 50481, stated at page 100 as follows:

(2) *Certain sheepskin scraps*, obtained from the linings of old coats or consisting of pieces of tanned sheepskin left over in the manufacture of wool-lined garments, are processed chemically after importation to obtain the wool which is used for the same purposes as ordinary wool is used. Accordingly, such scraps are dutiable as wool on the skin at the rate of 32 cents per pound of clean content under paragraph 1102 (b), Tariff Act of 1930.

Defendant, in its brief, further maintains that if the imported merchandise is held not to be "Wools * * * On the skin," as classified, then it is properly classifiable at the applicable rate under the provisions of paragraph 1105 (a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as "Wool wastes, not specially provided for."

Plaintiff called two witnesses, the first of whom was the president of the protesting firm. He testified that his company purchased the imported sheepskin or shearling scrap from fur dressers and dyers in the garment industry, as well as from garment manufacturers and fur dealers. He identified a "shearling," from which the scrap is obtained, as "a pelt with the hair on that has been shorn." (R. 7.) He described the imported merchandise as consisting of small pieces of fur scrap, varying from 1 inch in width and length to 2 or 3 inches in width and length. These are cut off during the process of manufacturing coats and similar articles. According to this witness, the hair or fiber on such scrap ranges from a quarter of an inch to an inch in length (R. 15). The witness further testified that the pelt from which the shearlings had been obtained had been tanned and was used for fur purposes, such as collars, interlinings, etc. After importation, the shearling scrap was processed by the plaintiff into a product called "tanner's wool," the process followed being described by the witness as follows:

These scraps are entered into vats, which contain about an 8 per cent sulphuric solution, and they are boiled in this sulphuric solution for a period of about an hour, in some cases longer. After that is boiled, the skin is dissolved to water during the process and just leaves the fur fiber, or the wool fiber, and it is removed then into extractors where it is put through an alkaline bath and then put through to dry, and in that condition it is being sold. (R. 16.)

Plaintiff's witness described this tanner's wool as being "wool that is recovered after the tanning process of a skin." (R. 16.) The witness also testified that this tanner's wool, because of the heavy tanning and treatment to which it is subjected, loses the natural felting qualities of wool and cannot be spun, but can only be used as an adulterant or filler in connection with long-fibered wools (R. 18, 19); that, if mixed with a virgin wool, the resultant product could be spun, but such a wool would only be used "to bring the price down some to manufacture a certain article." He stated that this tanner's wool is sold to woolen mills and garnetters and used in combination with nylons and virgin wool fibers, eventually producing a yarn used in

the production of various materials. He further testified that, unlike virgin wool, the fiber on the imported scraps cannot be pulled (R. 26). The testimony of this witness further established that out of a batch of 500 pounds of the imported material, approximately 150 to 200 pounds of tanner's wool is obtained, depending on the length of the fiber used. On cross-examination, the witness agreed that virgin wool of various lengths is sometimes blended, in one case with nylons (R. 39).

Plaintiff's second witness was the Canadian shipper of the imported shearling scrap. His company dealt in raw furs, fur scrap, jute scrap, nylon scrap, rayon scrap, and also produced tanner's wool. He testified that the "shearlings," from which the involved shearling scrap originated, were purchased by fur dressers and dyers and were then subjected to dressing and dyeing operations. The imported scraps are the cuttings from these fur skins. Such scraps are also obtained from mouton fur manufacturers. The witness further testified that the merchandise, as imported, is always dressed, sometimes tinted, and sometimes dyed in particular colors. He designated the imported merchandise (plaintiff's collective illustrative exhibit 2) as "sheepskin fur trimmings or scrap." (R. 54.) The witness recognized defendant's illustrative exhibit A as a high grade tanner's wool (R. 49), and defendant's illustrative exhibit B as "scraps of hair on the skin," which are not scraps of wool on the skin but which "have been fur dressed." (R. 62, 63.)

The testimony of defendant's witnesses does not in any material respect controvert the evidence introduced on behalf of the plaintiff with respect to the nature of the imported merchandise or the "tanner's wool" produced from such shearling scrap. Significant in the determination of the present issue is the testimony of two of defendant's witnesses, one of whom bought and processed merchandise such as that imported; the other, a buyer of tanner's wool for use in the manufacture or spinning of woolen carpet yarns. They corroborated the testimony of plaintiff's witnesses that "tanner's wool," produced from merchandise such as the imported shearling scrap, could not, because of the shortness of the fibers, be spun by itself but was only suitable for spinning into yarn, when blended or used as an adulterant with long-fibered wools to get a certain tensile strength. One of these witnesses also agreed that tanner's wool (defendant's illustrative exhibit A) is inferior in strength and in the desirable qualities of wool, to pulled wool or clipped wool (R. 103).

Defendant's third witness was a chemist in the United States Customs Laboratory who, in the course of his duties, had analyzed the scraps in defendant's illustrative exhibit B. He testified that these pieces were originally in the form of larger pieces of scrap (R. 68) which had been cut into smaller pieces. Upon examination of some

of the pieces in said sample, he testified that the pieces "show a slightly yellowish cast" which "would indicate that the large piece from which this was cut was similar to Exhibit 2, as far as color is concerned" (R. 79). He had not, however, made any examination as to whether the larger pieces of scrap were dressed or undressed and did not know whether they were or were not so processed. The testimony of this witness in no way controverted the testimony of plaintiff's witnesses to the effect that fur scraps, such as those here imported, were always dressed and sometimes tinted and dyed.

In the determination of the issue before us, certain decisions of our appellate court are pertinent. In *P. Silverman & Son* v. *United States*, 27 C. C. P. A. (Customs) 324, C. A. D. 107, the merchandise consisted of so-called Palmer or sanforizing blankets, imported in sizes, varying from 3 feet to 40 feet in width and from 5 feet to 50 feet in length. It appeared they were in a wornout condition and useless for their original purpose in textile finishing operations. The imported merchandise was sold as waste. It was conceded before the appellate court that the collector's classification of the merchandise as "woolen rags" (paragraph 1105 (a)) was erroneous, and no consideration was given to the "woolen rag question," but, as between "Wool wastes, not specially provided for," in paragraph 1105, and "Waste, not specially provided for," in paragraph 1555, Tariff Act of 1930, the court held the latter paragraph applicable to the imported merchandise. In so holding, the court stated, *inter alia*, at page 327:

> For reasons presently stated, we must conclude that the contention of the Government and the holding of the majority of the trial court cannot be sustained. We agree with the contention of the importer that Congress never intended to include within the term, "all other wool wastes not specially provided for" in paragraph 1105 every form of waste that might have a wool characteristic. * * * An analysis of paragraph 1105 discloses that everything named therein specifically had, either at the time of the passage of the act or at some time in the prior history thereof, a use in the wool industry in which it came in direct competition with wool.

Subsequently, in *P. Silverman & Son* v. *United States*, 32 C. C. P. A. (Customs) 99, C. A. D. 292, the involved merchandise consisted of discarded paper-mill felts, ranging from 15 to 18 feet in width and from 50 to 75 feet in length. The record disclosed that these felts had no commercial value except for the recovery of their component wool fibers by being processed to a fibrous condition known as shoddy and, subsequently, made suitable for use in the spinning of yarns to be made into cloth. The merchandise was classified under paragraph 1105 (a), as modified, as "Wool wastes, not specially provided for." Alternative claims were made in the protest, one being for classification under paragraph 1555, as "Waste, not specially provided for," which claim, however, was waived on appeal. The claim relied upon

on appeal was that the merchandise was classifiable as "Wool rags," either directly or by similitude, under paragraph 1105 (a), as modified. Our appellate court affirmed the holding of this court, which had over-ruled the plaintiff's claim for classification as "Wool rags." It did so, however, without approving the collector's classification of the merchandise as "Wool wastes," although it was pointed out by our appellate court that the merchandise there under consideration came in direct competition with wool. In this regard, the court, at page 104, stated:

* * * However, the mere fact alone that the instant merchandise is competitive with wool is not sufficient, in view of other considerations to which we shall presently allude, to require a holding that the instant merchandise properly responds to the term "all other wool wastes not specially provided for."

* * * We are brought to this conclusion by a consideration of the context of said paragraph and the legislative history bearing thereon.

In excluding the merchandise from the provision for all other wool wastes, not specially provided for, in paragraph 1105 (a), Tariff Act of 1930, our appellate court held, in effect, that the said provision is confined to wastes produced in woolen manufacturing operations prior to the weaving process. Under that statutory construction, the merchandise here involved, in its condition as imported, is removed from classification within the provision for "Wool wastes." This conclusion is consistent with the holding of our appellate court in the first *Silverman* case, *supra* (C. A. D. 107), where the court, after thoroughly reviewing the legislative history of the wool waste provisions of the tariff act, stated, at page 331:

From the foregoing it seems reasonable to conclude that Congress, in preparing the wool waste provision, was only concerned about wastes of wool which would influence and affect the sale and use of wool, and we think that a waste which happens to be composed of wool but which cannot, under any circumstances, replace or be competitive with wool, was not intended to be subjected to the high rate of duty of 24 cents per pound.

In holding certain woolen material properly classifiable as waste, not specially provided for, under paragraph 1555, under which the imported shearling scrap is claimed dutiable, our appellate court in *United States* v. *Maurice Lobsitz*, 35 C. C. P. A. (Customs) 146, C. A. D. 386, reviewed the *Silverman* cases, *supra*, and, at page 152, stated as follows:

We deem it unnecessary to review in detail the evidence respecting the replacement of, or competition with, wool by the imported merchandise. Practically all the testimony in the case, including that of the Government's witness Thomas (* * *) indicates that the fibers which can be derived from the materials represented by the respective Exhibits 1 and 2 are so short that it would be wholly impracticable if not impossible to spin them into yarn which could be woven into cloth. *The most that can be claimed to be shown by the testimony of Thomas on this point is that the short fibres could be placed with longer fibres which are spinnable,*

derived from other materials, and thus enter into the composition of shoddy, which he agreed is "really a form of cheapening shoddy." [Italics ours.]

The imported merchandise is not "Wool wastes," as alternatively claimed by the defendant. The record indicates that it is not competitive with nor does it replace wool and, under the authority of the *Silverman* and *Lobsitz* cases, *supra*, is precluded from classification under the wool waste provisions of paragraph 1105 (a) of the tariff act, as modified by T. D. 51802.

Further, the imported merchandise is not wool on the skin, for it is incapable of being used for the purposes for which wool, as contemplated under the provisions of paragraph 1102 (b) of the Tariff Act of 1930, as modified, *supra*, under which the involved merchandise was classified, is used. The testimony here shows that, unlike the wool provided for therein, the fiber remaining on the imported scrap cannot be pulled or be employed in spinning operations but can only be used, after processing, as an adulterant with long-fibered wools in the ultimate production of yarns. In its condition as imported, the merchandise here involved is not wool on the skin and, accordingly, is not dutiable as such. The controlling principle, as enunciated by this court in *A. C. Lawrence Leather Co. v. United States*, 21 Cust. Ct. 122, C. D. 1139, is that " 'wool' on imported skins is not an all-embrasive designation, intended to include under all conditions and in every circumstance the substance commonly known as wool, but is restricted to the commodity that has commercial value in itself as wool."

The record herein is persuasive that, in its imported condition, the shearling scrap here under consideration is a waste of fur skins. Since the present merchandise is waste, and it is not otherwise provided for, it is properly classifiable under the residuary provision for "Waste, not specially provided for," in paragraph 1555 of the Tariff Act of 1930, as amended, *supra*, and dutiable thereunder at the rate of 7½ per centum ad valorem, as claimed.

The protest is sustained. Judgment will be rendered accordingly.