(C.D. 2320)

C. J. TOWER & SONS OF NIAGARA, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 13, 1962)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff
*William H. Orrick, Jr.*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar, invoiced as boiled sheepskin scrap wool fiber or boiled wool sheepskin fiber, was

classified, by virtue of the provisions of paragraph 1559 of the Tariff Act of 1930, as amended, by similitude to "Card * * * waste," not carbonized, at 9 cents per pound under paragraph 1105(a) of the said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739. Plaintiff makes various claims for classification under the tariff act as follows: Directly, at the rate of 3½ cents per pound as wool flocks under paragraph 1105(a), as modified by the General Agreement on Tariffs and Trade, T.D. 51802; alternatively, as free of duty as hair of animals, unmanufactured, under paragraph 1688; alternatively, as wool flocks, by similitude, at the rate of 3½ cents per pound under paragraph 1105(a), as amended, *supra*; as a nonenumerated unmanufactured article at 5 per centum ad valorem under paragraph 1558, as modified by T.D. 51802, *supra*; or dutiable as a nonenumerated manufactured article at 10 per centum ad valorem under paragraph 1558, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, supplemented by T.D. 52827.

The record in the case consists of the testimony of two witnesses for the plaintiff and three witnesses for the defendant, together with 14 exhibits. Such reference will be made herein to the exhibits in question and to the testimony of the witnesses as is deemed pertinent to the discussion and determination of the issues involved. The witnesses for the plaintiff were Mr. Harry Wagman, president and general manager of E. Wagman & Co., Ltd., Toronto, Canada, the exporter of the merchandise under consideration, who had been engaged for many years as a dealer in synthetic wastes and the buying and selling of fur trimmings (R. 11), and Mr. Selby B. Groff, a dyer of all types of textile fibers, including flocks and card waste (R. 83), who had been engaged in selling card waste, flocks, and so-called tanner's wool for from 16 to 20 years (R. 84–85).

As representative of the merchandise covered by protest 59/12302, described as "scrap wool pastel, boiled wool sheepskin fiber," certain wool was received in evidence as plaintiff's illustrative exhibit 1, and a sample representative of the wool fiber covered by protest 59/12322, the so-called "white" boiled wool sheepskin fiber, was received in evidence as plaintiff's illustrative exhibit 2 (R. 16–18). Other exhibits were received in evidence as follows: A sample of tanned sheepskin scrap from a tannery (plaintiff's illustrative exhibit 3–A) (R. 21); a sample of tanned sheepskin scrap from the finished skin, purchased from the garment manufacturer (plaintiff's illustrative exhibit 3–B) (R. 21); a sample of "second" shearing flocks (plaintiff's illustrative exhibit 4) (R. 30); a sample of the combing flocks, pastel-colored, without skin, that are used as part of the raw material in producing the imported merchandise (plaintiff's illustrative ex-

hibit 5) (R. 35); a sample of combing flocks, white (plaintiff's illustrative exhibit 6) (R. 35); a sample of card waste (plaintiff's illustrative exhibit 7) (R. 44); a sample of the "first" shearing "to remove the pile from the dressed sheepskin" (plaintiff's illustrative exhibit 8) (R. 76); samples of tanned sheepskin scrap, produced by a domestic manufacturer (defendant's exhibits A, B–1, and B–2) (R. 103–106); a sample of a boiled wool product (defendant's exhibit C) (R. 140–142); and a sample of woolen card waste (defendant's exhibit F) (R. 211–212).

The plaintiff's evidence was, in substance, as follows: The raw material from which the imported merchandise (illustrated by plaintiff's exhibits 1 and 2) was made consisted of scraps of tanned sheepskin (as shown in plaintiff's illustrative exhibits 3–A and 3–B), purchased from "sheepskin dressers and dyers, as well as the garment manufacturers." These scraps were mixed with quantities of shearing flocks (plaintiff's illustrative exhibit 4) and combing flocks (plaintiff's illustrative exhibits 5 and 6). For the purpose of dissolving the skin bits attached to the wool, the mixture was boiled in a sulphuric acid solution, to which had been added a stripping agent. After the boiling process was completed, the mixed product was neutralized by an alkalizer as it passed through wringers and extractors. When dry, the material was baled and shipped. That is the product involved here (plaintiff's illustrative exhibits 1 and 2).

As a result of boiling the material in an acid solution, the wool fibers were damaged and weakened generally, and the felting qualities of the fibers substantially impaired (R. 39–41).

"Card waste" consists of the "droppings from a card, from a carding machine; when wool passes through it in the making of yarn, what falls through or sticks to the wire is a card strip, and what falls underneath is a card waste" (R. 42) (plaintiff's illustrative exhibit 7). The fibers are, therefore, not weakened and damaged, as in the case of boiled wool (plaintiff's illustrative exhibits 1 and 2). Card waste (plaintiff's illustrative exhibit 7) can be used by itself in spinning.

Boiled wool, such as the imported material (plaintiff's illustrative exhibits 1 and 2), is sometimes referred to in the trade in the United States as tanner's wool, but is not true tanner's wool, the real tanner's wool being pulled wool obtained from dead sheep by the lime process (R. 44–46). Throughout their testimony, however, the witnesses referred to the boiled wool product (plaintiff's illustrative exhibits 1 and 2) as tanner's wool.

Plaintiff's evidence indicates substantial differences between so-called "tanner's wool," or boiled wool, and "card waste." The imported merchandise is generally sold to garnetters or blenders of

fibers and may be used interchangeably with "flocks" to bring down the cost of woolen blends. Neither the boiled wool product nor flocks can be used alone for spinning, because the fibers of both are too short, and the boiled wool fibers are too seriously damaged for such use (R. 51).

It appears from the record that the origin of the boiled wool and card waste is entirely different. Plaintiff's witness Groff further testified that both the tanner's wool and the flocks are too short to run economically by themselves (R. 88); that "the card waste can be used in many places where tanner's wool can't, for the simple reason the card waste is an untreated fiber. It is stronger, has characteristics that the tanner's wool doesn't have, due to the acid treatment it has. It will dye better and spin to a stronger yarn" (R. 89). For all practical purposes, tanner's wool cannot be spun alone commercially and must be used as an adulterant or cheapener (R. 90).

The end use of boiled wool or "tanner's wool," sometimes sold as "boiled wool flocks," and flocks is about the same:

> Both products are used in garnetts in making garnetted stock, which in turn are used by the woolen mill for yarn and cloth. They are both used in wool blends as an adulterant, that is a cheapener. They are used in conjunction with other longer fibers in making wool batts; that is pillows for comforters.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> Both the tanner's [wool] and the flocks are too short to run economically by themselves. They would drop under the carding machines, and the waste which they would make would make the cost prohibitive to use them alone. Then they would produce a weak yarn. (R. 87–88.)

"Tanner's wool" has similar uses to shearing flocks (plaintiff's illustrative exhibit 8). Such flocks more closely resemble "tanner's wool" than they do "card waste." The "card waste," being untreated wool, "handles differently, dyes differently than the flocks," because shearing flocks are treated in the tannery. It is also more difficult to dye tanner's wool than "card waste," because the acid treatment of the former causes it to dye unevenly. Card waste, being similar to virgin wool, presents no such dyeing problem (R. 91–93); tanner's wool is commercially interchangeable generally with flocks, but is not generally commercially interchangeable with card waste (R. 95). Plaintiff's witness Groff further testified that the treatment to which plaintiff's illustrative exhibits 1 and 2 had been subjected was not a carbonizing process (R. 98–99).

The witnesses for the defendant were Mr. David Dickman, a sheepskin buyer for a concern engaged in the tanning of sheepskins (R. 101); Mr. Samuel Lobsitz, president of Lobsitz Mills Co., Nutley, N.J., wool scourer and processor, and also in the business of garnetting and carding and the blending of wool fibers, who testified that over

a period of 45 years he had become familiar and experienced with the various types of wools and wool wastes which are used in this country (R. 138); and Mr. William H. Myette, for some 28 years engaged in the buying and selling of wool, and also blending and garnetting. He stated that he was familiar with the uses of various wools and wool wastes for spinning purposes and with their uses in blends for spinning (R. 193–194).

Defendant's witness Dickman, after identifying defendant's exhibits A, B–1, and B–2 as representative of the type of sheepskin that is tanned in his tannery, testified that he was familiar with and had observed the production of "shear flocks"; that the average length of shear flocks obtained from such skins would be approximately 1 inch (R. 107). He further testified that combing flocks, plaintiff's illustrative exhibit 6, are "the residue of the combing machine when it is combing a skin," but that this combing process is different from that of "carding" (R. 110). A great deal of his further testimony bore on matters not here under consideration.

Government's witness Lobsitz agreed that the imported boiled wool (plaintiff's illustrative exhibits 1 and 2) is sold commercially as tanner's wool, which he stated "is the result of boiling sheepskin and other tannery products" (R. 139). Defendant's witnesses, however, showed no familiarity with true tanner's wool under that name. The testimony of defendant's witnesses generally, too, was in accord with that of plaintiff's witnesses that wool fiber is damaged through an acid boiling process (R. 144–148) and that so-called tanner's wool is usually "used in blends with other waste materials, or with wool, and in one process it is just blended through a mechanical blender. In other processes, it goes through a garnetting or carding process" (R. 149). Defendant's witness Lobsitz showed but little familiarity with "flocks," his use of them being "very limited" (R. 152–153). On cross-examination, this witness testified that the process by which the so-called tanner's wool (plaintiff's illustrative exhibits 1 and 2) is produced is not a "carbonizing" process (R. 160). He further testified that the boiled tanner's wool under consideration and "card waste" are comparable in their uses in blending for spinning purposes (R. 149, 166). However, on cross-examination, he admitted that "card waste" and boiled wool (tanner's wool) are different commercial products (R. 174). This witness also pointed out these essential differences between so-called tanner's wool and card waste: (1) They are produced by different methods; (2) boiled wool (tanner's wool) is whiter and cleaner than card waste; (3) there is a difference in staple length (R. 174–177). While the witness hedged somewhat on an outright statement that the fiber in card waste is stronger than the

staple in boiled wool (plaintiff's illustrative exhibits 1 and 2) (R. 177–178), yet, it is undisputed that card waste is derived from untreated wool, and the witness admitted that through the acid treatment and boiling to which "tanner's wool" is subjected:

The fiber becomes tender, and if you would observe a wool fiber under a microscope, it has natural barbs on it, and the finer the wool the more barbs it contains. Various chemical and mechanical processes will tend to eliminate these barbs from the wool fiber, and would reduce the diameter of it, and at the same time reduce the strength of it. [R. 145.]

Any chemical process, or even a mechanical process affects the fiber, and very often the staple as well. [R. 145.]

Government's witness agreed that wool fiber, such as that represented by plaintiff's illustrative exhibits 1 and 2, in its condition, cannot be spun without being further processed (R. 181–182); that a card waste cannot be spun without any carding or preliminary process (R. 184); that card wastes are used with other wools and longer materials for spinning (R. 187); and that a boiled wool fiber blend and a card waste blend go through "approximately" the same processing to be spun into yarn (R. 188).

Defendant's witness Myette testified that plaintiff's illustrative exhibit 1 is representative of tanner's wool generally with respect to the length of the staple, as is plaintiff's illustrative exhibit 2. He stated that such tanner's wool, to his knowledge, has never been called "boiled wool fiber flocks" (R. 196). He agreed that the effect of boiling on a wool fiber—any chemical action on a fiber—is injurious. Mr. Myette testified that boiled wool fibers are used in conjunction with other wastes and wools, in one case by blending with a better wool (R. 199–200). He further stated that the shear flocks used by him for boiling purposes are "probably a half inch or under"; that there are better flocks probably an inch to an inch and a quarter in length; and that the shear flocks are used "primarily as an admixture in boiling with the scrap sheepskin trimmings or clippings" (R. 202). In this connection, the witness testified "You can't use flocks generally speaking, these flocks, as is; * * * so you can't put those in a carding machine, because it would ruin the machine" (R. 203); and that 95 per centum of the flocks from tanneries must be treated to remove skin bits (R. 205). Mr. Myette described a "flock" as "a shearing from a wool on the skin bits in it" and stated that "The boiled wool is the wool obtained from the scrap sheepskin"; and that, before being used in blends, flocks must go through a preliminary operation, but that boiled fibers, such as those represented by plaintiff's illustrative exhibit 2, can be put through a mixing picker with virgin wool. The witness stated that he would not accept flocks as a good delivery for

tanner's wool; that flocks and tanner's wool, or boiled wool fibers, are "different items," having different characteristics, and that, on a practical commercial basis, a "shear flock" cannot replace tanner's wool in a blend (R. 206–207).

On cross-examination, Mr. Myette agreed that merchandise, such as plaintiff's illustrative exhibits 1 and 2, would have to be carded before being spun (R. 221), stating that all fibers must be carded before being spun (R. 225).

The nub of the difference between plaintiff's evidence and the testimony offered by defendant is that plaintiff's witnesses said, in effect, that the imported boiled wool more nearly resembles flocks in its uses than it does card waste, while, on the other hand, the evidence of the Government is intended to show that tanner's wool (plaintiff's illustrative exhibits 1 and 2) is more similar in use to card waste than it is to flocks.

There is no testimony whatever in the record identifying the imported merchandise as card waste. It was not classified as card waste *per se* but as such by similitude. The preponderance of the evidence leads us to the conclusion that, based upon the facts in this case, merchandise of a kind illustrated by plaintiff's exhibits 1 and 2 should not be classified as card waste by similitude. The boiled wool referred to by the witnesses as tanner's wool differs so widely from card waste in the manner of its production, the nature and strength of its staple, and its use, that it cannot, in the face of the facts, be classified as card waste by similitude. The imported product consists of wool waste derived from the boiling of tanned scraps, purchased from tanneries and manufacturing plants, which were mixed with combing and shearing flocks and boiled in a sulphuric acid solution to dissolve attached skin scraps. This process materially weakened the fiber and injured its felting properties and, on the whole, made it unfit for use except as a blender or an adulterant with better fibers, or for use in the manufacture of batting, mattresses, etc. On the other hand, card waste is derived from untreated wool in the carding process. Its fibers retain their strength and felting qualities. According to the preponderance of the testimony, the uses of card waste and the imported product are generally not the same; they are different commercial products.

Reference to authoritative dictionaries and other reliable sources is of assistance in determining the nature of card waste, which product is defined in The Modern Textile Dictionary, second edition, 1957, by George E. Linton, on page 106, as follows:

CARD WASTE: The wastes of all types taken from a card—fibers, shives, motes, dirt, strips, and the rest. The cylinder, doffer, and the revolving flats on a cotton card give the most waste.

It may be pointed out that Dr. Linton, in 1957, was dean of the textile department of the Fashion Institute of the University of the State of New York, and textile editor for American fabrics magazine.

The American Wool Handbook by Von Bergen-Mauersberger, second edition, 1947, pages 271–272, refers to card waste, its origin and uses, as follows:

Soft waste is a product of woolen and worsted carding, combing and drawing and is classified as card waste, combing waste, roving waste and laps (soft waste from worsted drawing and spinning). The main characteristic is that the material is still in a fibrous condition and, therefore, in most instances these wastes are blended with virgin wools before carding. Card-stripping, combing wastes, fly and floor wastes must undergo dusting and opening treatments. Straight colors and mixed blends of course, have to be kept separate. The woolen spinner is the main user of soft waste. [Italics quoted.]

We have found no definitions for boiled wool, nor have we found any discussions referring to boiled wool as such. There are, however, numerous references to the term "flock" or "flocks." The American Wool Handbook, supra, page 272, discusses flocks as follows:

Flocks resulting from piece scouring, fulling and raising are of a low grade because of uneven length and their mixed and soiled condition. Shear flocks are obtained from cropping or shearing piece goods and constitute a valuable raw material for pressed felts, packing of bedding and wall papers. They are more even in length and generally cleaner than the flocks from scouring and fulling, but may contain up to 5 per cent lubricating oils picked up during the shearing process. They are employed in fulling low grade woolens to give additional weight by felting the short fibers into the tacked goods. [Italics quoted.]

The Modern Textile Dictionary, supra, defines flock and flocks, pages 288–289, as follows:

FLOCK : * * *

2. A lock of wool or hair.

3. Woolen or cotton waste, old rags, etc., reduced to a degree of fineness by machinery, and used for stuffing.

4. Very short fibrous particles of wool, rayon, cotton, and so on, chiefly those from shearing-pile fabrics, napped goods, etc. Sometimes wool has sufficient length to be used in blends, but it is often powderlike in form.

5. Rayon flock obtained from rayon staple or tow, as well as from the waste materials mentioned above.

FLOCKS : Soft, short fibers of wool thrown off by certain processes of woolen and worsted manufacture.

The New Century Dictionary, 1946 edition, pages 587–588, defines the term "flock" as follows:

flock * * * A lock or tuft of wool, hair, etc.; pl. or sing., wool refuse, shearings of cloth, old cloth torn to pieces, etc., used for stuffing mattresses, upholstering furniture, etc.; also, finely powdered wool, cloth, etc., used in making flock-paper; * * *.

The Encyclopaedia Britannica, 1947 edition, volume 9, page 384, in referring to the term "flock," states:

FLOCK. * * *

2. * * * a tuft of wool, cotton, or similar substance. The name "flock" is given to a material formed of wool or cotton refuse, or of shreds of old woollen or cotton rags, torn by a machine known as a "devil." This material is used for stuffing mattresses or pillows, and also in upholstery. * * *

It is clear from the definitions given by various authorities that merchandise of the type of plaintiff's illustrative exhibits 1 and 2 is not a true tanner's wool, although it is frequently referred to under that name. This court, in the case of *Fairfield Wool Co., Inc.* v. *United States*, 33 Cust. Ct. 199, C.D. 1653, recognized the use of the term "tanner's wool" as applied to a product obtained from processing pieces of sheepskin shearling scrap, purchased from dressers and dyers in the garment industry, as well as from garment manufacturers and fur dealers. It appeared that the shearling scrap there involved was processed after importation by the plaintiff therein into a product called tanner's wool, used as an adulterant with long-fibered wools. The court, in the *Fairfield* case, held the imported scraps properly classifiable as "Waste, not specially provided for," under paragraph 1555 of the Tariff Act of 1930, as claimed. Real tanner's wool, as testified by the plaintiff's witnesses and as confirmed by authoritative definitions, is a different product entirely from that illustrated by plaintiff's exhibits 1 and 2. In Linton's Modern Textile Dictionary, *supra*, tanner's wool is defined as—

Synonymous with the lime process used to obtain pulled wool (that taken from dead sheep) from the pelt of the animal.

This is quite similar to the definition of pulled wool by the same authority:

This is obtained from the pelts or hides of dead sheep. It is inferior in all respects to fleece wool, which is taken from live sheep. The stockyard centers produce pulled wool. However, the packing houses are interested mainly in the carcass; the wool is of secondary consideration. They dispose of all this stock to textile plants.

There is more pulled wool produced per year than first-clip wool. Pulled wool is used with better grades of fleece wool to make woolens and worsteds.

We shall, however, adopt the term "tanner's wool" in referring to the product of the kind illustrated by plaintiff's exhibits 1 and 2, since it was referred to by that name by the witnesses on both sides.

It seems clear, from the testimony in this case and from the definitions and authoritative quotations set forth, that the imported merchandise is not as a matter of fact properly classifiable as card waste either *per se* or by similitude. The collector's classification, therefore, cannot be upheld.

This court has, of course, heretofore, as have other courts, decided cases upon the facts alone. (See *Willey Biggin Wool Service, Inc.* v. *United States*, 32 Cust. Ct. 462, Abstract 58022.)

The next inquiry is, should the imported merchandise have been classified as flocks *per se* or by similitude?

It has heretofore been held by this court, in the case of *Walker Services* v. *United States*, 24 Cust. Ct. 190, C.D. 1230, that—

> The statutory term "flocks" is to be given broad judicial interpretation. Such a construction was emphasized in *United States* v. *Imperial Wall Paper Co.*, 14 Ct. Cust. Appls. 280, T.D. 41886, which arose under the Tariff Act of 1922 and was decided in November 1926. There, the merchandise consisted of wool ground into powder and used in the making of wall paper. It had been classified by the collector as a manufacture of wool under paragraph 1119 of the Tariff Act of 1922, and claimed by the importer to come within the *eo nomine* designation for "flocks" in paragraph 1105 of the Tariff Act of 1922. Arguing to support the collector's classification, the Government contended that the product should [not] be classified as flocks because it was not within the class of articles included among the named wools in said paragraph 1105, which, for the purposes of the present discussion, can be regarded as the same as paragraph 1105, as amended, *supra*, invoked herein by plaintiff. Disagreeing with the Government's theory, the appellate court held that "flocks" is a specific term, used by Congress without any limitation or restriction, and, extending its wide interpretation, stated further that "it makes no difference what flocks are used for as long as they are flocks. The future may develop other uses for flocks, and, notwithstanding this fact, they would still be flocks and covered by the specific provision of paragraph 1105."

The *Walker* case also pointed out that Congress reenacted the provisions of paragraph 1105 in the Tariff Act of 1930 with the imputed knowledge of the interpretation given to the term "flocks" in the *Imperial Wall Paper Co.* case, *supra*, and thereby gave legislative sanction to that decision.

The material in the *Walker* case was described in the following manner:

> The merchandise is a waste or refuse obtained from sheared sheepskins. When the raw skins are received in the tannery, they contain oil, grease, and dirt. To remove such impurities, the skins are washed, pickled, tanned, dried, stretched, and the fleshing is removed to induce pliability. To make them available for their ultimate uses, i.e., in the manufacture of mouton skins, boys' coats, aviators' jackets and boots, vests, slippers, gloves, powder puffs, polishers, and linings for toys, the skins are subjected to a series of shearing operations, through which the pile is brought to a uniform length of approximately three-eighths of an inch. The byproduct of each shearing is known as a flock.

> A conglomerate mass removed from sheepskins during several shearing processes, incapable of use for spinning purposes because of the shortness of the fibers and the presence of foreign matter, particularly skin bits, describes the merchandise. In its imported condition, it is used for stuffing toys, batting for

upholstery, making wall paper and roofing products, and as filter for comforters and quilts.

It appears, however, in that case, that the importer used part of the imported merchandise "as an adulterant in wool blends, combining the imported product with better grades of waste, like lap, top, yarn, and thread wastes, and then running the entire collection through a garnetting machine that mixes the fibers into a material suitable for spinning into yarn." The court further pointed out that, in preparing the imported merchandise for use in the last-described manner, it had to be processed for the removal of skin bits.

In its decision, the court, in the *Walker* case, *supra*, page 193, stated:

> The record shows that the common characteristics of all flocks are the shortness of the fibers and the clearness of the material. None is capable of being spun commercially. * * *

and, at page 194, the court, in observing certain quoted definitions of "flock," stated that—

> * * * the absence therefrom of any reference to the source of material identified as flock, is significant. Such omission affects seriously defendant's contention, as stated in counsel's brief, that flocks are "the by-product of specific treatment in the manufacture of woolen fabrics."

The court, in the *Walker Services* case, *supra*, held that the uncontradicted testimony therein showed that the commodity in question was short refuse wool "whose general characteristics and variety of uses are those of 'flocks,' within the common meaning thereof," and, accordingly, held the involved product classifiable, as such, under paragraph 1105 of the Tariff Act of 1930, as modified, at the rate of 3½ cents per pound, as claimed.

The uncontradicted testimony in the instant case shows that the imported material is a mixture of shearing flocks or second shearing wool (plaintiff's illustrative exhibit 4), combing flocks (plaintiff's illustrative exhibits 5 and 6), and wool removed from scraps of sheepskin, boiled in a sulphuric acid solution to remove the skin. This mixture is illustrated by plaintiff's illustrative exhibits 1 and 2. In our opinion, the merchandise at bar is properly classifiable by similitude to wool "flocks," as claimed by the plaintiff. Paragraph 1559 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954, T.D. 53599, provides:

> Par. 1559. (a) Each and every imported article, not enumerated in this chapter, which is similar in the use to which it may be applied to any article enumerated in this chapter as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that

particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

The record herein shows that the boiled wool fiber here under consideration more closely resembles wool "flocks" in use than it does card waste. This is established by the differences shown in the record between the involved merchandise and "card waste." The imported merchandise has been chemically treated and contains skin bits and has to be garnetted because of the bits of skin remaining in the material after boiling (R. 55). Card waste, on the other hand, is an untreated fiber and has no skin bits (R. 161, 165). Government witness Lobsitz agreed that card waste has already been put through the process which prepares it for spinning and usually contains no skin bits. The boiled wool fiber, in its imported condition, cannot be spun, but is carded after reaching its imported condition (R. 175). Accordingly, it would appear that boiled wool fiber cannot be used in the same way as card waste. The record discloses that wool flocks, on the contrary, do contain skin bits, and the boiled wool fiber is used in the same manner as flocks. Further, as is indicated by the testimony, heretofore referred to, of both the witnesses for the plaintiff and those for the defendant, there are many fundamental differences between the merchandise represented by plaintiff's illustrative exhibits 1 and 2 and card waste. Further, even assuming that the imported merchandise resembles both wool flocks and card waste in "use," the record clearly shows that, with respect to "material," the product under consideration more nearly resembles wool flocks than it does card waste, a consideration which would render the importation in question properly classifiable under the provisions of paragraph 1559, as amended, *supra*.

In our opinion, the preponderance of the testimony in this case shows that the imported merchandise comes within the classification of "flocks," as defined in the *Walker* case, *supra*. In view of this holding, we deem it unnecessary to discuss other claims made by the plaintiff.

For the reasons hereinbefore stated, we hold the merchandise properly dutiable under paragraph 1105(a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, by similitude to wool flocks, at the rate of 3½ cents per pound, as claimed. To the extent indicated, the protests are sustained. In all other respects and as to all other claims, the protests are overruled.

Judgment will issue accordingly.